**DALLAS TRANSIT COMPANY, Appellant,**

**v.**

**Alfred Lowell NEWMAN, Appellee.**

**No. 16345.**

Court of Civil Appeals of Texas.

Dallas.

May 29, 1964.

Rehearing Denied July 10, 1964.

Turner, Atwood, Meer & Francis and Dean Carlton, Dallas, for appellant.

Woodruff, Hill, Bader & Kendall, David M. Kendall, Jr., Dallas, for appellee.

DIXON, Chief Justice.

Dallas Transit Company has appealed from a judgment for $23,650 awarded to appellee Alfred Lowell Newman for property damage and personal injuries resulting on May 21, 1962 from a near collision between a bus owned by appellant and a dump truck owned by appellee.

## FACTS

The accident occurred at the intersection of Skillman Avenue and Eastridge Street in the City of Dallas. Skillman Avenue is a divided thoroughfare running in a general direction of North and South. Northbound traffic travels on a two-lane way separated by a median strip from a two-lane way on which southbound traffic travels. The median strip is several feet wide.

Eastridge Street is a comparatively narrow blacktop roadway running in a general direction of East and West. Its two-way traffic is separated by a yellow stripe down the middle of the street. There are stop signs facing Eastridge Street on the west and the east boundary lines of Skillman Avenue. There is no stop sign at the median strip.

On the occasion in question appellee was operating his 1955 model dump truck, loaded with gravel, in a northerly direction on Skillman Avenue. There was some testimony that he was going about thirty-five miles per hour, but the testimony in general on that point is not definite, though it is to the effect that his speed was less than the forty-five miles per hour speed limit in effect at this point on Skillman Avenue.

Appellant's 1944 model bus, a chartered vehicle, was carrying about sixty school children. It was traveling in an easterly direction on Eastridge Street. It had stopped at the stop sign facing Eastridge Street. Following the stop the bus began its movement across Skillman Avenue. It proceeded straight across at a slow, steady pace of five to seven miles per hour. It neither slowed down nor accelerated its

speed. It did not stop at the median strip before proceeding into and across the eastern half of Skillman Avenue. The driver of the bus testified that he had "floor boarded" the acceleration pedal but the bus would not pick up speed. He testified that he had time to make it across the intersection ahead of appellee's oncoming truck.

Appellee's truck had rounded a curve at the top of a hill estimated to be about 1000 feet from the intersection. The testimony is not clear as to how far he was from the intersection when he first saw the bus. He saw appellant's bus start out across the intersection. He began honking his horn. He thought that the bus would stop at the median strip. When he realized that the bus was going to continue on across into the lanes for northbound traffic on Skillman he not only honked his horn but applied his brakes. His tires left skidmarks approximately 43 feet long.

When appellee saw that a collision was imminent he swerved sharply to the left in an effort to miss the moving bus by passing to its rear. This maneuver was successful. The truck narrowly missed the rear of the bus. However, when appellee attempted to straighten out the course of the truck by swerving back to the right, the rear wheels of the truck struck the concrete curb of the median strip with the result that the truck turned over and appellee sustained injuries. The more serious injuries were to his shoulder and especially his leg. The truck was practically a total loss.

The bus continued on its way. Some of the children told the bus driver that the truck had turned over. They wanted the driver to stop the bus so they could go back to the scene of the overturned truck. The bus driver declined to stop the bus. He did not stop until he reached Abrams Road, the next regular scheduled stop, some distance east of Skillman Avenue. He testified that he did not learn that the truck had turned over and appellee had sustained injuries until about one month after the accident.

The jury found that appellant's bus driver was negligent (1) in failing to keep a proper lookout, (2) in failing to stop at the median strip, (3) in failing to yield the right-of-way, (4) in failing to apply his brakes, and (5) that appellant was negligent in permitting the operation of the bus when it would not accelerate to an increased speed when crossing the intersection. Appellant does not challenge the above findings, Nos. (1), (2), (3) and (4). Each act of negligence was found to be a proximate cause of the accident. All contributory negligence issues and an issue on unavoidable accident were answered in favor of appellee.

OPINION: I. JURY MISCONDUCT

In its first point on appeal appellant alleges jury misconduct in that one or more of the jurors discussed (1) attorneys' fees and (2) insurance; and (3) one of the jurors told of his personal experience and gave expert testimony to the jury on the subject of future medical expenses because of the possibility of cancer developing from appellee's injured leg.

At the hearing on the motion for new trial appellant offered the testimony of only one juror, Henry M. McRae. He testified that the foreman, S. E. Jones, said that appellee would not get all the money—that attorneys usually got a fee of one-half, one-third or one-fourth of the recovery. McRae testified that there was quite a discussion on this subject, everyone talking and the discussion was audible to all jurors; and that the jurors were not rebuked for discussing the subject.

As to the insurance, McRae testified that two of the jurors in arguing with him asked him what he was arguing about—he wasn't the one who would have to pay it. To which McRae replied that they would all have to pay it from now on, and two of the jurors agreed that "definitely insurance would—the insurance rate, we would still have to pay it." As to whether these statements were made in the presence of all the

jurors McRae stated, "Well, that was figured in what I said earlier provided it wasn't all going to all go to Mr. Newman, * * *."

In regard to increased medical expenses in the future due to cancer which might develop McRae testified that a juror named Bolton said that he knew of a person who thought his injured leg was well, but afterward he developed cancer in that leg, and "they tied the cancer in the leg to the accident that had happened." When asked whether this statement was heard by all the jurors McRae testified, "Oh, sure, it was heard." He testified also that no one rebuked Bolton for making the statement.

In rebuttal appellee offered the testimony of two jurors. The juror Jack Redding testified that as a group the jurors did not discuss attorneys' fees. As to whether there was anything mentioned about attorneys' fees Redding testified, "Not to my knowledge." He was asked whether he recalled anyone mentioning insurance. He replied, "Not to my knowledge, no, sir." There was no discussion by the jury as a group about insurance.

With reference to any discussion of cancer of the leg Redding testified that the jury did not discuss it as a group. If there had been he would have remembered it. If it was mentioned at any time he did not hear it.

S. E. Jones was foreman of the jury. He testified that at one time someone said he wondered what the attorneys were going to get out of this and Jones, as foreman, answered, "I must admonish you on this point; we must only consider the evidence that we have, and the attorney's fees are not evidence here."

As to whether there was any mention of insurance Jones testified, "Not to my knowledge." He didn't remember the word "insurance" even being brought up; if it had been mentioned he thought he would remember it. It could have been mentioned.

When asked about the alleged discussion in regard to whether cancer might develop in appellee's injured leg, Jones said that to his knowledge there was no mention of it. There was deliberation about damage to the lymph gland in appellee's leg. (There was medical testimony in support of lymph damage.) Jones admitted that it was possible someone may have mentioned cancer, but it wasn't brought out in the deliberations as far as he could remember.

■■■ In passing on the question of jury misconduct there are two fundamental rules to be applied: (1) if the evidence is conflicting as to whether the alleged act of misconduct actually occurred, a fact issue is raised and the finding of the trial court is binding on the appellate court; and (2) if misconduct occurred a new trial will be granted only in the event it reasonably appears from the record of the whole case that injury probably resulted to the complaining party. Barrington, et al. v. Duncan, 140 Tex. 510, 169 S.W.2d 462; State v. O'Dowd, 158 Tex. 348, 312 S.W.2d 217; Younger Bros., Inc. v. Myers, 159 Tex. 585, 324 S.W.2d 546; Taylor v. Dallas Transit Co., Tex.Civ.App., 351 S.W.2d 554; Welsch v. South Texas Construction Co., Tex. Civ.App., 373 S.W.2d 123.

In applying the above rules to the record in this case we have reached the conclusion that reversible error is not shown because of alleged jury misconduct.

■■■ The record indicates that attorneys' fees were mentioned. There was a conflict in the testimony as to whether the foreman admonished the jury not to consider the subject. We must presume that the trial court made implied findings which support the judgment. Higginbotham v. O'Keeffe, Tex.Civ.App., 340 S.W.2d 350, 357. Therefore, we presume that the foreman did admonish the jury. That being so we cannot say that the mention of attorneys' fees probably harmed appellant. There is no evidence that the subject was mentioned after the admonition, and we

cannot say that mention of it influenced the jury in its verdict. Aetna Casualty Co., v. Perez, Tex.Civ.App., 360 S.W.2d 157; Kendall v. Southwestern Public Service Co., Tex.Civ.App., 336 S.W.2d 770; Trice Contract Carpets & Furniture Co. v. Gilson, Tex.Civ.App., 329 S.W.2d 476, 482; City of Fort Worth v. Estes, Tex.Civ.App., 279 S.W.2d 687; J. D. Wright & Son Truck Line v. Chandler, Tex.Civ.App., 231 S.W.2d 786; McCullough Box & Crate Co. v. Liles, Tex.Civ.App., 162 S.W.2d 1055.

■ As to insurance the testimony of McRae and Redding is in conflict at least as to whether there was any discussion of insurance by the jury as a group. Redding did not explain exactly what he meant when he said, "Not to my knowledge, no, sir."

Apparently the discussion, if there was one, was an argument in which it was agreed that a large verdict might result in an increased insurance rate. Such an argument could hardly be injurious to the defendant, appellant here. The subject so far as the record shows, was referred to only the one time.

In this connection we must point out that insurance was indirectly referred to in the trial by one of the witnesses, Nathan David Haberman, a school boy fifteen years of age, who was a passenger on appellant's bus. On cross examination by appellant this witness testified as follows:

"Question: Nathan, I guess—was it Mr. Russell Smith with this law firm here that came out and talked to you at first about the accident?

"Answer: No, it was an English gentleman from—I think it was from an insurance company.

"Question: All right; was that the truck insurance?

"MR. BADER: If the court please, we object to any statement with reference to who or what it was.

"THE COURT: All right, I sustain the objection.

"Question: Well, in any event, after the English gentleman left—nobody from the bus company has talked to you, have they?

"Answer: No, sir.

"Question: Now, did Mr. Russell Smith then come around and talk to you, Mr. Newman's lawyers?

"Answer: No, sir.

"Question: Who was it that came and talked with you?

"Answer: The only person that talked to me about the wreck was the English gentleman from the insurance company."

It will be observed that objection was at first made by appellee and sustained as to "who or what it was" in regard to the above testimony. Nevertheless, appellant for a second time asked the question which again elicited the answer that the person who talked to the witness was "the English gentleman from the insurance company." No objection was made to this second reference to insurance. No request was made for the court to instruct the jury to disregard the reference to insurance. No motion to declare a mistrial was made. The statement stands unchallenged in the record. It was before the jury.

We do not say that the voluntary reference to insurance by the witness on cross examination gave the jury a license to discuss insurance in their later deliberations. But the statement elicited for the second time by appellant without objection or challenge seems almost to pave the way for the jury to mention the subject. Certainly the circumstances tend to weaken appellant's position now in claiming reversible error because insurance may possibly have been mentioned in the jury room.

Under the circumstances and in the light of the record as a whole we cannot say that

the reference to insurance in the jury room, if it occurred, constituted reversible error, or that it reasonably appears that such reference to insurance probably resulted in harm to appellant. Putman v. Lazarus, 156 Tex. 154, 293 S.W.2d 493; Walker v. Thompson, Tex.Civ.App., 287 S.W.2d 556.

■ With respect to the alleged reference to cancer in connection with the jury's deliberations concerning future medical expenses we again find conflict in the evidence as to whether there was a group discussion of the subject or whether the comment, if it was made, was heard by all the jurors. In any event, we think it does not constitute reversible error. The jury's finding of future probable medical expenses was $3,000. The court required and appellee agreed to a remittitur of $2,500. This cured the error if there was error originally in regard to future medical expenses.

Appellant's first point on appeal is overruled.

## OPINION: II. OTHER POINTS ON APPEAL

■ In its second point on appeal appellant asserts that the jury's answer to Special Issue No. 15 is contrary to the evidence and is so against the overwhelming weight and preponderance of the evidence as to show bias, prejudice and passion resulting in manifest injustice.

Special Issue No. 15 inquired whether appellee "failed to timely apply the brakes on the truck in question." The jury answered "No."

It is undisputed that appellee did apply his brakes. The skidmarks of the truck's tires extended for 43 feet. Appellee testified that he began applying his brakes farther back than the point where the skidmarks began. The witness Haberman testified that the truck started slowing down about 100 feet "down the road" and "— well, he slowed down faster than I would say a car slowed down * * *" Appellant's second point is overruled.

■ In its third point appellant contends that the court erred in the submission of Special Issue No. 12 because same "constituted a comment upon the weight of the evidence highly prejudicial to the defendant and was without support in the evidence."

The jury found in answering Special Issue No. 12 that it was negligence for appellant to permit the operation of the bus when it would not accelerate to a greater speed than it did when crossing the intersection.

The evidence is undisputed that the bus slowly proceeded across the street at a speed of five to seven miles per hour and that it did not accelerate its speed. Appellant's driver himself testified that he "floor boarded" the acceleration pedal but the bus would not respond. It was a 1944 model bus which had traveled more than a half million miles as shown by the undisputed evidence. It is not a comment on the weight of the evidence for the court in wording an issue to accept as established a fact which is supported by the undisputed evidence of the witnesses, including the complaining party's chief witness. The jury's answer that it was negligence for appellant to permit operation of the bus under the circumstances is amply supported by the evidence. Appellant's third point is overruled.

■ Appellant's fourth point charges that the jury's answer to Special Issue No. 22–B is so grossly excessive as to show bias, prejudice and passion and is without support in the evidence notwithstanding a remittitur of $2,500.

The jury in answering Special Issue No. 22–B found that $3,000 would reasonably compensate appellee for future doctor and medical bills.

Dr. Waggoner's bill was only $76 to the date of the trial. There was in addition a bill for $40 for x-ray pictures taken by Dr. Waggoner's direction—a total of $116. The bill for Dr. Graham's treatment during the first nine weeks after the injury is not

shown. The record does show that in connection with his treatment of appellee Dr. Graham also caused x-rays to be made. The evidence is that appellee will require future medical treatment and will have to make periodic trips to see a doctor. The length of time over which this future treatment might extend was uncertain and indefinite.

We would sustain this point on appeal were it not that we are convinced that whatever error there was in the jury's answer was cured by the remittitur of $2,500, leaving a recovery of only $500 for future medical and doctors' bills. Because of the remittitur we overrule appellant's fourth point.

In its fifth point appellant attacks the jury's answer to Special Issue No. 22 on the ground that the amount found as damages, $21,500, is so grossly excessive as to show bias, prejudice and passion on the part of the jury.

The court instructed the jury that in answering the issue it might take into account (a) physical and mental pain, if any, to the time of the trial; (b) probable physical pain and mental suffering in the future, if any; (c) loss of earnings, if any, in the past; and (d) probable diminished capacity to labor and earn money in the future, if any.

The evidence is to the effect that appellee suffered a wrenched shoulder, a hurt leg, a cut on his hand, two cuts on his head and bruises on both hips, both sides and practically all over his body. At the trial appellee testified that all his injuries had healed except those to his shoulder and his leg. He still bears a scar on his head.

On the day he was hurt, May 21, 1962, he went to see Dr. Graham at the Dallas Medical & Surgical Clinic. He remained there an hour and a half. X-rays were taken. He was given whirlpool and sonic heat treatments. After about nine weeks appellee changed to Dr. Waggoner because

Dr. Graham's treatment did not seem to help his leg. Dr. Waggoner diagnosed his leg trouble as lymph damage and impaired drainage from the leg. He prescribed "rest, that is, no weight bearing on this extremity for awhile; hot soaks; elevation of the extremity; a support type stocking; and certain drugs which tend to cut down inflammation or swelling." Later Dr. Waggoner took x-rays of appellee's leg. At the time Dr. Waggoner first saw him appellee was not able to perform work as a truck driver. The doctor had seen appellee eight times up to the time of the trial. In about three months the doctor had appellee back on light duty. Appellee still complains that if "at any time he stays on this extremity to work or to drive his truck, or any other activity of any strenuous nature at all, he has a recurrence of swelling and pain in his right leg." This complaint is consistent with the doctor's findings on examination. In the doctor's opinion there has been "some improvement" since he first saw appellee, though not as much as he had hoped. The doctor felt that appellee will have further trouble with his leg for approximately another year and will be needing to see a doctor during that time. And after a year he likely will continue to have "flare-ups" from time to time if he puts a lot of stress and strain on the leg.

Appellee was off from work from May 21, 1962 until July 29, 1962. Since then he has missed from one to two days a week from his work. Several witnesses testified that on occasion when they saw him appellee gave indications of being in pain.

At the time of his injury appellee was forty-five years old. He owned his own dump truck and was in business for himself hauling dirt, gravel, sand, etc. His injury occurred at the best time of the year for his work. His gross earnings would run from $800 to $1,100 per month. Now when appellee works he tries to keep his leg elevated by propping it against the truck panel. He is often unable to sleep and his wife has to put hot and cold compresses on his leg to alleviate the pain.

Several witnesses testified that appellee since his injury has walked and still walks with a limp.

We need cite no authorities to support us when we say that we are not permitted to set aside the finding of the jury as to the amount of the damages merely because we probably would have found a lesser amount had we been sitting as a jury. In the face of the record before us we cannot say that the jury's finding is so grossly excessive as to show bias, prejudice and passion on the part of the jury.

Appellant's fifth point is overruled.

The judgment of the trial court is affirmed.

Affirmed.